Need, Justice {Ret.),
sitting by designation, dissenting,
with whom JoNes, Chief Judge, joins:
The facts found by the court lead us to a conclusion contrary to its judgment.
Taxation should not be subject to evasion by arrangements, no matter how clever. Since Lucas v. Earl, 281 U.S. 111, where a husband by a contract, valid inter partes, agreed that all earnings and gifts received by him should be considered as received by him and Ms wife as joint tenants, the rule has been that “attenuated subtleties” do not evade a tax. This “technically elegant arrangement” through “lawyers’ ingenuity” does not seem to change the fact that Nahke actually participated in the profits from the gaming operation.[1] Such transactions must be “viewed as a whole.”[2]
*38 Plaintiff, prior to the arrangement with the Moose, operated a printing business that produced tickets, protected by trademarks, used in wagering baseball pool transactions. These tickets were distributed by Eahke’s organization through agents and dealers, and he received all the profits. Because of the wagering tax provisions of the Eevenue Act of 1951,[3] imposing a ten percent tax on the wagers, his operation lost money, and plaintiff reorganized the business by arranging for it to be operated by a fraternal organization as described in the court’s opinion and findings of fact. It was hoped that the activities, when carried on in the name of the Order of the Moose, would be exempt from the wagering tax.[4]
To get this hoped-for exemption, the plaintiff transferred his trademarks, his operating space, equipment, and trained personnel to the Moose. He advanced the money for starting the pool, $9,000. We assume that all this was done for fair compensation. He agreed to produce the necessary tickets only for the Moose. Furthermore, plaintiff helped, apparently without pay, with the estimates and orders for the tickets to carry on the enterprise. Plaintiff agrees that his printing gross for the three months of this operation was $326,291.10.
In one sense, it is true that if the lottery was profitable to the operator, “the Moose got the profit.” But only after, the plaintiff had skimmed off the cream of the profits by his sale of the baseball tickets to the Moose. Before this agreement Eahke operated the entire gambling process including the printing of the tickets, their sale, and the distribution of prizes to winners. The arrangements with the Moose effected a division of this operation into two parts. We cannot acquiesce in the majority’s view that this artificial division of what is in fact an integrated process into two *39 parts worked any legally significant change in Rahke’s status as a “person who is engaged in the business of accepting wagers” or as a “person who conducts a wagering pool or lottery.” [5]
The Moose lodge involved here was not a “dummy” in the normal use of the term in that it did enjoy some independent existence apart from its function as Rahke’s agent in this scheme. The artificiality here was in the attempt to give the appearance that these were two unrelated enterprises engaged in connected but different businesses, when in fact this was one operation run by one group of persons. If we do not completely ignore the role played by the Moose lodge in this operation as a mere subterfuge, at very least we must recognize that Rahke and the lodge were joint venturers in this business. As such they come under the conclusion enunciated in Woodard v. Campbell, 235 F. 2d 268 (1956), and are each liable for the tax.
We would therefore enter judgment for the defendant.
Whitaker, Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, a citizen of the United States, and a resident of Indianapolis, Indiana, brings this action to recover an amount paid under protest which had been assessed against him and others for Federal wagering excise taxes. The defendant has filed a counterclaim in which it seeks an additional amount which has been assessed and remains unpaid.
2. During all periods of time involved herein, the plaintiff was the owner of all the outstanding shares of stock of Rahke Printing Co., Inc., and Silent Salesman Co., Inc., *40 each of which entities is a corporation organized and existing under and by virtue of the laws of the State of Indiana, and is engaged in the printing business with its principal place of business at 433 North Park Avenue, also known as 601 East Michigan Street, Indianapolis, Indiana.
3. During all times involved herein, the plaintiff was the lessee of a printing business known as Masten Printing Co., which printing business was a sole proprietorship owned by Hazel Masten Jenkins and located at 433 North Park Avenue, Indianapolis, Indiana.
4. During all periods of time involved herein, Rahke Printing Co., Inc., was the sole owner of certain trademarks consisting of pictorial representations of various phases of the moon and a bolt of lightning, which trademarks were commonly known as “Rahke Moon” and “Rahke Lightning”, respectively, and were registered with the Secretary of State of Indiana under the provisions of Acts 1891, c. 116, Section 1, p. 317, as amended (Burns’ Ind. Stat. Ann., Section 66-107 (1951 Repl.)).
5. During all times mentioned herein, Silent Salesman Co., Inc., was the sole owner of certain trademarks consisting of the words “moon” and “lightning,” which trademarks were registered with the Secretary of State of Indiana under the provisions of Acts 1891, c. 116, Section 1, p. 317, as amended (Burns’ Ind. Stat. Ann., Section 66-107 (1951 Repl.)), and on which words the Commissioner of Patents had issued trademark registrations No. 326,772 and No. 326,959, respectively.
6. During all periods of time mentioned herein, Masten Printing Co. was the sole owner of certain trademarks consisting of pictorial representations of various phases of the moon and a bolt of lightning, which trademarks were commonly known as “Masten Moon” and “Masten Lightning.”
7. At all times involved herein, the plaintiff was the owner of a two-story building located at 433 North Park Avenue, Indianapolis, Indiana.
8. The plaintiff’s father died while the plaintiff was in military service. His father had been in several business enterprises, the most lucrative of which was the printing and manufacturing of baseball pool tickets through Silent *41 Salesman Co., Inc. The plaintiff’s father invented the Moon and Lightning system of daily baseball pools in 1913. The system was copyrighted in Washington, D.C., and registered in Indiana in 1925.
9. The plaintiff and his stepmother purchased Silent Salesman Co., Inc., which she operated until his release from military service. Shortly after his release from such service, the plaintiff, together with his stepmother, operated Silent Salesman Co., Inc., which was then engaged in the printing of baseball pool tickets. This continued until the summer of 1948 when the plaintiff formed Eahke Printing Co., Inc., a similar business. Apparently the plaintiff thereafter purchased his stepmother’s interest in Silent Salesman Co., Inc. He owned that company during 1952.
10. Beginning about December 1948, the plaintiff, in addition to printing the baseball pool tickets, was also engaged in distributing them. This was because the people who, prior to that time, had been performing the distribution of the tickets (who had purchased them from the plaintiff), found that * * * “the political climate wasn’t fruitful for their enterprises at that time” * * *.
11. The distribution of baseball pool tickets is unlawful under the Indiana laws relating to lotteries.
12. Baseball pool tickets are printed on large block sheets of 120 tickets. The tickets making up these sheets are cut into individual tickets, which are pasted in cardboard books, and then the tickets are sold to customers by dealers. Lightning tickets are based on three numbers, and each set has 2,024 tickets. Moon tickets are based on four numbers, and each set has 10,626 tickets. Winning tickets depend on the baseball scores of teams in the National League, American League and American Association. The winning tickets are those having the teams scoring the highest number of runs. Tickets sell for 5, 10, 15 and 25 cents, and pay in prizes from $200 for a 5-cent Moon ticket, to a prize of $1,000 for a 25-cent Moon ticket. There are also prizes paying lesser amounts. There are 21 prizes on each set of Moon tickets, and 22 prizes on each set of Lightning tickets. In the winter, prizes are determined by numbers taken from daily newspapers.
*42 13. Baseball pool tickets are distributed to an agent or a dealer each week and are for use the following week. Each day’s tickets are in a separate package. When the tickets are delivered to the dealer the tickets unsold from the prior week are picked up. The dealer always has two weeks’ supply of tickets, the current week’s and the next week’s. Normally the operator has more tickets than he sells. Rahke’s gross sales would be between 70 percent and 80 percent of the number of tickets purchased from the printing companies. Normally winnings were a little over 60 percent of gross sales. From the standpoint of the operator, the gamble is that if the unsold tickets are the ones that would have hits if they had been sold, the operator makes money. If the unsold tickets would not have hits, then there is an excessive portion of hits in the sold tickets and the operator loses money.
14. The plaintiff, in addition to the three printing companies, owned three companies which he described as “operating companies.” These were called Hoosier City Sales Company, Capital City Sales Company, and Hasten Specialty Company. Each of these firms was engaged in the sale and distribution of baseball pool tickets. The tickets printed by Rahke Printing Co., Inc., were sold to Hoosier City Sales Company and in turn distributed to participants in the baseball pool through agents or dealers of the latter firm. Similarly the tickets printed by the Silent Salesman Co., Inc., were sold to and distributed by Capital City Sales Company, and those of Hasten Printing Co. were sold to and distributed by Hasten Specialty Company. The printing firms occupied the first floor, and the “operating companies” occupied the second floor of the building described in finding 1.
15. The plaintiff received the profits earned by the three “operating companies” named above.
16. The baseball pool is a lottery, since the purchaser of a baseball pool ticket has paid for a chance to win prizes based upon the outcome of a baseball game. A winner would learn by looking at a newspaper and checking the baseball scores whether he had won a prize.
*43 17. By the terms of section 471 of the Revenue Act of 1951 (Public Law 183 of October 20,1951, 65 Stat. 529) a 10-per-cent tax was imposed upon wagers, including wagers placed in a lottery conducted for profit. By its terms, it became effective on November 1,1951.
18. Prior to November 1951 a meeting had been held, attended by the plaintiff and those individuals who were then engaged in the selling of baseball pool tickets, for the purpose of discussing how they should operate their business after the effective date of the 10-percent wagering tax. It was apparently agreed among them that each would reduce the amount of prizes so that additional funds would be made available for the payment of the wagering tax. The plaintiff did reduce the prizes in his operations and paid the tax beginning about November 1,1951. After a short period of operation, however, the plaintiff suspected that his competitors were not following the agreement and were operating in such a maimer that they were not reducing their prizes and not paying the tax. This caused him to lose business.
19. About December 1, 1951, the plaintiff increased the amount of prizes to the point where they had been previously, and continued to pay the 10-percent wagering tax. This continued until June 30,1952.
20. On June 6, 1952, the plaintiff wrote to the Commissioner of Internal Revenue, with copies sent to the Attorney General of the United States, the Chairman of the Senate Finance Committee, and to the Chairman of the House Ways and Means Committee, in part as follows:
This is to notify you that certain businesses in Indianapolis, Indiana are operating in violation of Sub-chapter A — Tax on Wagers — of the Internal Revenue Code. This is well known by the Collector’s office at Indianapolis. Because of the long delay, it is apparent that .no action is contemplated by the Revenue officials. My interest in this matter is one of self-preservation, for it is impossible to compete with non-taxpaying lotteries.
The writer is engaged in the operation of a baseball pool coupon business in Indianapolis as a retailer. When the Federal Tax Law became effective Nov. 1, 1951, the 10% wagering tax was collected and paid to *44 the Collector each and every month. This would have been impossible had the tax been absorbed, since my business is operated on less than a 2.5% net profit on gross wagers. The 10% tax was collected as a separate charge. This raised the price of my tickets 10% higher than those of my competitors. We have also notified all of our agents that they must have the Special Tax Stamp for Wagering.
None of my competitors have done this. They have felt that a loophole in the law made it possible for them to identify themselves with some American Legion., Y.F.W., or other organization, and thereby avoid the tax. They have done this, and have not paid the tax. They have also informed all agents that it is not necessary to purchase the Special Tax Stamp if they do business exclusively with them. Under these conditions of competition, it is impossible for me to remain in business and obey the law.
Forty years ago my father, Emil K. Eahke, invented the system of baseball pool operation known as “Moon” and “Lightning.” One of my companies, the Silent Salesman Co., Inc., holds Federal copyrights on these. We enjoy in Indiana 'a superior reputation for honesty and fair dealing. None of our competitors has been in business over eight years, and recently they all have been [in] trouble with the Internal Eevenue Department.
My attorneys have not even investigated the possibility of my associating myself with some fraternal organization, for we have felt that the purpose of the law was to collect more revenue, rather than to raise the profit of what might possibly be tax-exempt fraternities. And certainly one cannot believe that my competitors have chosen to give these fraternities their profits. No matter how the connection may show on paper, the big percentage of the profits will obviously inure to the former owner. A thorough investigation would show that what is an attempt at “tax avoidance” is really a “tax evasion.”
I understand that my competitors’ attorneys are trying to show cause why their clients should not pay the 10% tax. That reason certainly cannot be that it would put them out of business, because I have paid the tax and have remained in business, even in the face of non-taxpaying competition. If your office would enforce the law, all of us would remain in business on the same basis; and revenue for the United States from that source would be considerable.
*45 The following is a statement of taxes I have paid, according to Regulation 132, since Nov. 1,1951.
Nov. 1951. $3,976.64
Dec. 1951. 2, 990. 73
Jan. 1952. 4,746. 39
Feb. 1952. 4,063. 60
Mar. 1952. 3,954. 80
Apr. 1952. 6,295.12
$26, 027.28
The following is a list of my competitors who have violated Regulation 132.
* * # * *
Not one of my competitors has paid the 10% wagering tax since December 1951. It is a conservative estimate that the United States has lost over $250,000 in collectible taxes from them alone since December 1951.
I am requesting the [that] immediate action be taken to enforce the law in this area. Or, unless immediate action is taken, since my business cannot survive much longer against non-taxpaying competition, I request permission to operate my business exempt from Regulation 132 likewise.
21. About the middle of June, 1952, the plaintiff’s bookkeeper told him that he had lost about $60,000 so far that year and that he could operate for about two weeks before he would be broke. The plaintiff talked to Wilbur Plummer [Assistant Collector of Internal Revenue] and to his attorneys about his situation and thereafter called Walter Thompson on the telephone. Walter Thompson was formerly a competitor of the plaintiff, selling a baseball pool ticket known as “Big Tom”. Mr. Thompson told the plaintiff he had gone out of business and that the Moose in Rush-ville, Indiana, were selling the tickets. Thompson told the plaintiff to contact Mr. Chester Fryberger at the Moose Lodge in Rushville, Indiana, about taking over his ticket operation. The plaintiff and Fryberger met at Rushville that night and discussed the feasibility of the Rushville Moose taking over the operation of the plaintiff’s baseball pool ticket business.
22. Mr. Chester Fryberger is now employed as a plant engineer for a printing concern and also is an instructor *46 in accident prevention, safety, first aid and life saving for the American Red Cross in Indianapolis, Indiana. He is now 59 years old. In the year 1945 Fryberger was employed as superintendent of the Indianapolis Moose Country Club at Glens Valley, Indiana. Fie was employed there for about five years. Thereafter he was sent on a special dispensation from the Supreme Lodge of the World, Loyal Order of Moose, to Greenfield, Indiana, a town about 19 miles east of Indianapolis. The Greenfield Moose Lodge was in’ debt some $28,000 or $29,000 and the Club part of the Moose was in debt between $2,600 and $3,000. Fryberger was told by Mr. Ray Gibbens, Supreme Prelate of the Loyal Order of Moose, Supreme Lodge of the World, to make some money and some big money fast in Greenfield. Fryberger supplemented the income of the Greenfield Moose by gambling activities and ran a bingo game in the Lodge Auditorium on Tuesdays, Wednesdays, Thursdays, Sunday afternoons and Sunday nights. Fryberger’s operations brought the Greenfield Moose Lodge out of debt and he was sent to Rushville, Indiana, Moose Lodge No. 1556, in the latter part of 1951 or early 1952.
23. The Rushville Moose Lodge at the time Fryberger was sent there was in debt some $46,000 to $48,000 and the Club part of the Lodge was in debt between $3,000 and $3,500. Fryberger was told to do the same kind of job that he had done at Greenfield. He was to make some money to clear up the indebtedness of the Rushville Moose. In the year 1952 Fryberger was Vice President of the Indiana State Moose Association. He was also secretary and club manager of the Loyal Order of Moose 1556, Rushville, Indiana.
24. The Moose Lodge and the Moose Club are different in that in the By-Laws of the Moose Lodge there are prohibitions against certain activities. To get around these restrictions the members organize social quarters known as the Moose Club of that particular Lodge. The organization of such clubs is provided for in the By-Laws of the Moose Lodge.
25. When Fryberger got to Rushville he set out to secure some means of making money for the Rushville Moose. He had read in the newspapers and had learned from talking *47 to people that certain gambling operations were available to tax-exempt organizations such as the Moose. He found that the “Big Tom” baseball pool operation was available to the Rushville Moose and at a special officers’ meeting of the Rushville Moose No. 1556, held on March 10, 1952, was authorized “to purchase the Big Tom enterprise and to operate the lottery in the nature of a baseball pool.” Fry-berger signed the minutes of this meeting as Secretary and William Beam, Governor of the Rushville Moose, also signed the minutes as Governor.
26. On June 25, 1952, Governor Beam called an officers’ meeting of the Rushville Moose Lodge “to decide if the Lodge was interested in taking on the purchase of another baseball pool known as the Rahke Tickets.” It was decided to “take advantage of the opportunity.” These minutes were also signed by Chester Fryberger as Secretary and William Beam as Governor of the Rushville Moose. The trustees of the Rushville Moose gave Fryberger full authority to act for them in taking over the baseball pool operation. Trustee Joyce of the Rushville Moose knew that the baseball pool was a gambling operation in which tickets were sold.
27. After the plaintiff and Fryberger met in Rushville, Indiana, concerning the acquisition of the plaintiff’s baseball pool operation by the Rushville Moose, Fryberger came to Indianapolis and met with the plaintiff at the offices of the plaintiff’s attorneys, Dunbar and Dunbar. The plaintiff told his attorney, Lucien Dunbar, that he was going completely out of the baseball pool business and for him to prepare three contracts to sell tickets from each of the printing companies to the Rushville Moose Lodge No. 1556. On June 30,1952, each of the three printing companies, Rahke Printing Company, Inc., Silent Salesman Company, Inc., and Masten Printing Company entered into written agreements with Rushville Lodge No. 1556 of the Loyal Order of Moose whereby the printing companies granted to the Rushville Moose the exclusive right and license to use the trade names and trade-marks of the printing companies for a period of one year beginning on June 30, 1952. In the same agreements the printing companies agreed to manufacture baseball pool tickets exclusively for the Rushville Moose as the Moose *48 should order and to sell the tickets to the Moose at the rate of $50 for a set of 10,626 Moon tickets and $13 for a set of 2,024 Lightning tickets. Also on June 30,1952, the plaintiff, by a written agreement, leased to the Kushville Moose the second floor of the building at 601 East Michigan, also known as 433 North Park Avenue, plus certain personal property for a period of one year at a monthly rate of $400 a month.
28. Mr. David Woods, an expert witness in real estate appraisal, physically examined the second floor of the building at 601 East Michigan Street or 433 North Park Avenue in the year 1956 and stated that in his opinion the fair market value of the monthly rental of the lease of the second floor of the building at 433 Park Avenue, Indianapolis, Indiana, on June 30, 1952, was $450 a month. The payment of $400 a month rent for the lease of the second floor of the building and personal property of the plaintiff to the Kush-ville Moose was reasonable in amount.
29. The Kushville Moose, under its agreement with Kahke Printing Company, Inc., Silent Salesman Company, Inc., and Masten Printing Co., paid $50 for a set of 10,626 Moon tickets and $13 for a set of 2,024 Lightning tickets. This price included with the tickets all the accessories that went along with the operation. These accessories included hit cards, run down cards, check up cards, order sheets and distribution sheets. The Kushville Moose paid $26 a set for the Big Tom tickets. They had approximately the same type of tickets as the so-called Kahke ticket. The payment was $26 a set right straight through for all types of tickets. In 1949 and 1950, the plaintiff was paying the printing companies $40 for a set of Moon tickets and $10 for a set of Lightning tickets. In the first part of 1952 when the plaintiff was losing money on the pool operation the price was lowered to $33 for the Moon tickets and $7.50 for Lightning tickets. In effect it was the plaintiff paying his own corporations for the tickets, so that the price paid for the tickets at that time had little meaning.
30. The profit and loss statements of Kalike Printing Company, Inc., Silent Salesman Company, Inc., and Masten Printing Co., for the years 1950 to 1953, inclusive, and for the three months July, August and September of the years *49 1950 to 195B, inclusive, do not show unusual profits for the period of the operation of the baseball pool by the Eush-ville Moose. Fryberger after investigating the reputation of the so-called Eahke ticket and comparing it with other tickets considered the price paid for the so-called Eahke ticket to be fair and reasonable. The price paid by the Eushville Moose to Eahke Printing Company, Inc., Silent Salesman Company, Inc., and Hasten Printing Co. for baseball pool tickets was fair and reasonable.
31. After the execution of the agreements with the Eush-ville Moose, the plaintiff devoted all of his time to the three printing companies, Eahke Printing Company, Inc., Silent Salesman Company, Inc., and Hasten Printing Co. In connection with the sale of tickets to the Eushville Moose, the plaintiff helped for a period with the future orders of tickets of the Moose. It takes six weeks from the beginning to the final step in the printing of a baseball pool ticket. The plaintiff’s sales of pool tickets had dropped considerably before the Moose took over, but the Moose anticipated a much larger sale and the printing companies had to increase their production immediately to supply the Moose. The plaintiff worked closely with the Moose in determining future orders of tickets. He spent two or three hours a week for about three weeks in estimating future need for the tickets.
32. During the first week in a baseball pool operation the operator must pay off bets before he has collected the money from that week’s sale of tickets from the dealers. The first week the Moose took over the operation of the pool operation, the plaintiff loaned them $9,000. This loan was reflected on the books of the Moose as cash in the bank and an account payable to the plaintiff. The $9,000 was repaid to the plaintiff and the repayment was reflected on the books of the Moose Lodge.
33. The plaintiff had no agreement with the Moose Lodge at Eushville regarding profits or losses from the operation of the baseball pool by the Moose. Prior to June 30, 1952, the plaintiff was running three printing companies, Eahke Printing Company, Inc., Silent Salesmen Company, Inc., and Hasten Printing Co. The plaintiff was operating three companies in the baseball pool ticket business, Hoosier Cities *50 Sales Company, Capitol City Sales Company, and Masten Specialty Sales Company. After June 29, 1952, the plaintiff’s three companies operating the baseball pool and selling tickets to dealers went out of business.
34. When the Moose Lodge of Rushville took over the operation of the baseball pool ticket business, Fryberger went to the employees of the plaintiff and asked if they would continue working for the Moose of Rushville, Indiana. Fryberger employed Mr. Paul Nugent, Mr. Richard Smith and Mrs. Gertrude Owen at their same salaries except for Mrs. Owen, to whom he gave a raise of $5 per week. Fry-berger came into the office at 601 East Michigan Street, Indianapolis, Indiana, on the average of every other day and checked on operations of the baseball pool.
35. On June 30, 1952, the Rushville Lodge No. 1556, L.O.O.M., filed with The Indiana National Bank of Indianapolis, Indianapolis, Indiana, a resolution showing the authority of the Lodge to open a deposit account in the name of the Moose and designating Mrs. Gertrude Owen, Employee, Mr. Paul A. Nugent, Employee, and Mr. Chester H. Fryberger, Secretary, to sign checks for the withdrawal of funds. Pursuant to this authority a bank account was opened in the name of the Rushville Moose No. 1556 with the Indiana National Bank.
36. On June 30, 1952, Mrs. Owen opened a new set of books for the Rushville Moose. Fryberger bought new ledgers and new books and instructed Mrs. Owen to keep a good set of books. Mrs. Owen had previously been the bookkeeper for the plaintiff and she kept the new set of books for the Moose in the same manner that she formerly had kept the books for the plaintiff. Mrs. Owen is a good bookkeeper. The plaintiff removed the books Mrs. Owen had previously kept for Hoosier Cities Sales, Capitol City Sales and Masten Specialty Sales from the building.
37. Prior to June 30, 1952, only the plaintiff could sign checks on the baseball ticket lottery operation. Mrs. Owen could not sign checks prior to June 30,1952. After June 30, 1952, Mrs. Owen, Mr. Nugent and Mr. Fryberger all had authority to sign checks on the baseball pool ticket operation which money was deposited in the new bank account. The *51 plaintiff could not sign checks on the baseball pool ticket operation after June 29,1952.
38. Prior to June 30,1952, the plaintiff knew the combination to the safe maintained in the offices of the baseball pool ticket operation. After the Rushville Moose took over the baseball pool ticket operation from the plaintiff on June 29, 1952, the combination of the safe was changed and the plaintiff no longer knew the combination to the safe.
39. Beginning with June 30, 1952, Federal withholding of income tax and social security tax statements were prepared by the Rushville Moose and were sent to the District Director of Internal Revenue covering employees of the Rushville Moose. These statements and the Federal income and social security tax withheld and paid to the District Director were for Mr. Nugent, Mr. Smith, and Mrs. Owen, employees of the Rushville Moose and formerly employees of the plaintiff. The checks to the District Director of Internal Revenue were drawn on the bank account of the Rushville Moose maintained at the Indiana National Bank, Indianapolis, Indiana.
40. Fryberger, as secretary of the Moose Lodge at Rush-ville, made quarterly reports to the office of the Supreme Lodge of the Moose at Mooseheart, Illinois. The reports reflect the financial activities of the Moose Lodge. The reports from the Rushville Moose Lodge reflected the financial return from the baseball ticket lottery operation although not specifically set out in the report. The sums from the baseball lottery were reflected under the heading “Donations”. For the three-month period August 1,1952 to October 31, 1952, the report shows receipts for the Lodge of $2,251.36 and on the Club side receipts of $2,506.91. For the period May 1 to July 31,1952, the report reflects receipts for the Lodge of $2,000 and for the Club of $1,286. Some expenses of the Rushville Lodge and expenses for operation of the baseball pool were paid out of the bank accounts of the baseball pool operation. Money was transferred from the bank account of the Rushville Moose at the Indiana National Bank, Indianapolis, Indiana, by check to Rushville Lodge No. 1556 L.O.O.M., Rushville, Indiana. Only the net profits went to the Rushville Moose and until the profits were *52 transferred from the Moose bank account at the Indiana National Bank in Indianapolis to the Moose account in Rush-ville the sum would not be reflected in the quarterly reports sent to the Supreme Lodge. For the period of operation of the baseball pools by the Rushville Moose, the Moose received around $12,000 to $13,000.
41. The Rushville Moose employed Mr. Lew Angermeier to obtain a ruling from the Commissioner of Internal Revenue regarding the liability of the Rushville Moose for the Federal wagering excise tax. Mr. Lew Angermeier is an associate of George S. Olive and Company, which is a firm of Certified Public Accountants in Indianapolis, Indiana, having somewhere between 36 and 40 accountants. A request for a ruling on behalf of the Rushville Moose was filed on July 30 and September 15,1952. In addition the George S. Olive Company made an audit of the Moose books covering the former “Big Tom” baseball ticket lottery operation and undertook an audit of the Moose operation of the former Rahke baseball ticket lottery operation. Angermeier went to Washington, D.C., and talked to officials of the Internal Revenue Service in an effort to get a ruling of the Revenue Service that the Rushville Moose was exempt from the wagering excise tax. The Rushville Moose Lodge paid George S. Olive Company for their work in attempting to get the ruling. The Rushville Moose paid George S. Olive Company the sum of $750 for the audit of the Moose books involving the lottery operation. The check was drawn on the Rushville Moose bank account at the Indiana National Bank, Indianapolis, Indiana, in which the money from the baseball pool ticket lottery formerly conducted by the plaintiff was deposited. The Rushville Moose books, maintained by Mrs. Owen, properly reflected this payment.
42. The request for the ruling filed by Angermeier on behalf of the Rushville Moose was signed by William Beam, Governor of the Loyal Order of Moose, Rushville Lodge No. 1556 and was attested by Chester Fryberger, Secretary. The seal of the Rushville Moose Lodge was impressed over part of Fryberger’s signature. In the request for ruling dated September 15, 1952, filed by the Rushville Moose *53 Lodge No. 1556, with, the Commissioner of Internal Revenue, the Rushville Moose state, among other things, that:
a. The Rushville Moose began on J une 30, 1952, and has [sic] since continued the operation of a lottery involving the sale of baseball tickets.
b. Fryberger was duly commissioned by the Rush-ville Lodge as secretary and was confirmed by the Supreme Council of the Supreme Lodge of the World Loyal Order of Moose.
c. The operation of the lottery was “by and exclusively for the benefit of the applicant”.
d. The Rushville Moose borrowed $9,000.00 to begin operations and opened a bank account at the Indiana National Bank, Indianapolis, Indiana.
e. The Rushville Moose employed Paul Nugent, Richard E. Smith, Gertrude C. Owen and Lawrence Hilton (part time) to conduct the baseball pool activity.
f. The price paid by the Rushville Moose to Rahke Printing Company, Inc., Silent Salesman Company, Inc., and Masten Printing Co. for the baseball tickets was reasonable.
43. About the middle of September, 1952, Fryberger came to the plaintiff and told him that the Federal tax department had said that the Moose might not be able to operate without paying the wagering tax and that a ruling was coming on the point. Several days later Fryberger talked to the plaintiff again and said that it looked like the Moose would be taxable and asked to break the contracts between the Rushville Moose and the printing companies and the lease between the Rushville Moose and the plaintiff. It was agreed that the contracts be terminated September 30, 1952. On September 30,1952, the plaintiff went back into the baseball pool ticket operation and began collecting and paying the tax as did his competitors.
44. Anyone engaging in wagering activities is required by law to purchase a $50 wagering stamp. These stamps expire at the end of the Government’s fiscal year on June 30. The plaintiff purchased a stamp for the period November 1, 1951 to June 30, 1952. From the period June 30,1952 to September 29, 1952, the plaintiff had no wagering stamp. On September 29, 1952, the plaintiff bought from the Revenue Service a wagering stamp that would expire on June 30, *54 1953. Tbe plaintiff had no wagering stamp for the period June 30, 1952 to September 29, 1952, the period covered by the operation of the baseball pool by the Rushville Moose. The ¿Revenue Service did not proceed against the plaintiff for failure to purchase a wagering stamp for the period June 30,1952 to September 29,1952.
45. Sometime in February, 1953, an auditor of the Supreme Lodge of the Moose appeared at the Rushville Moose office and relieved Fryberger of his job as secretary of the Rushville Moose Lodge. Fryberger was not relieved of his office of Vice President of the Indiana State Moose Association and served out his term of office. Fryberger was told that he had violated the by-laws of the Moose by permitting gambling by the Rushville Moose and that he was fired.
46. The plaintiff was not engaged in operating a baseball ticket pool and was not engaged in the business of accepting wagers for the period June 30, 1952, to September 30, 1952.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover five hundred dollars ($500), with interest as provided by law. The court further concludes that defendant is not entitled to recover on its counterclaim and its counterclaim is dismissed.

 See Griffiths v. Commissioner, 308 U.S. 855, 357.

 Commissioner v. Court Holding Co., 324 U.S. 331, 334.

 65 Stat. 529.

 26 U.S.C. (I.R.C., 1939) § 3285(b)(2)(B) exempted from tax: “any drawing conducted by an organization exempt from tax under section 101, if no part of the net proceeds derived from sucb drawing inures to the benefit of any private shareholder or individual.”
Id., § 101 exempted from tax: “(3) Eraternal beneficiary societies, orders, or associations (A) operating under the lodge system or for the exclusive benefit of the members of a fraternity itself operating tinder the lodge system ; * * *”

 26 u.S.C. (X.R.C., 1939) § 3285(6) :
“Persons liable for tax. Each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax under this sub-chapter on all wagers placed with him. Each person who conducts any wagering pool or lottery shall be liable for and shall pay the tax under this subchapter on all wagers placed in such pool or lottery.”